George James **BARNARD** and Philip Weinstein et al., Appellants,

v.

**UNITED STATES of America,**
Appellee.

No. 17746.

United States Court of Appeals
Ninth Circuit.

Feb. 3, 1965.

Rehearing Denied April 20, 1965.

Madden, J., dissented in part.

Dwight L. Schwab, Denton G. Burdick, Jr., Hutchinson, Schwab & Burdick, Portland, Or., for appellant Philip Weinstein.

Alan R. Jack, Oregon City, Or., Peter A. Schwabe, Jr., Portland, Or., for appellants George James Barnard, John Norris Barnard, William Mack Lasiter and Raymond Knippel.

Sidney I. Lezak, Acting U. S. Atty., Portland, Or., A. Lawrence Burbank, Sp. Asst. to the U. S. Atty., Dist. of Or., San Francisco, Cal., for appellee.

Before JERTBERG, Circuit Judge, MADDEN, Judge, Court of Claims, and DUNIWAY, Circuit Judge.

DUNIWAY, Circuit Judge:

These five appeals are from judgments of conviction rendered against the appellants after a jury trial upon an indictment for violation of Title 18, U.S.C. § 1341 (mail fraud) and Title 18, U.S.C. § 371 (conspiracy).

The indictment alleged that the defendants had planned and carried out certain automobile collisions, in each of which an automobile, which we may call the weapon car, would be intentionally crashed into the rear end of another automobile which we may call the target car. The weapon car's driver and owner would be insured by liability insurance against liability for damage to persons or property, caused by the operation of the weapon car. The target car would

be occupied by two or three persons who were aware that the collision was going to occur. They would pretend that they had suffered injuries to their necks and backs as a result of the collision; would make claims and, if necessary, file suits against the driver and owner of the weapon car, which claims or suits would be answered by the insurance companies which carried the liability insurance on the weapon car. The collisions all occurred in Portland, Oregon.

The mail fraud feature of the case, which brought it into the federal court, was that, in the course of negotiation for settlement of the fraudulent claims of the voluntary victims, and the payment of the claims, the United States mails were used.

The appealing defendants are Philip Weinstein, George James Barnard, John Barnard, William Lasiter and Raymond Knippel. The charges in the indictment may be summarized as follows:

*Counts I and II.* George Barnard, Arthur Roscoe Smith and Larry Warren Hayes are the named defendants. The staged accidents occurred on February 16, 1960. Hayes drove the weapon car, Smith the target car. George Barnard was convicted under these counts and sentenced to three years on each, concurrent.

*Count III.* George Barnard, Donald William Johnstone, Patricia Ann Deplois, Knippel and Lasiter are the named defendants. The staged accident occurred on September 5, 1959. Johnstone drove the weapon car, Deplois the target car. George Barnard was convicted under this count and sentenced to four years, consecutive to his sentence under counts I and II. Knippel and Lasiter were also convicted, and each sentenced to four years.

*Counts IV and V.* George Barnard, Darrel Wayne Saunders and David Leon Boisjolie are the named defendants. The staged accident occurred on October 16, 1958. One Swertfeger, alias Scott, drove the weapon car, one Rose the target car. George Barnard was convicted under these counts and sentenced to three years

under count IV, concurrent with his sentence under count I, and to four years under count V, concurrent with his sentence under count III.

*Count VI.* George Barnard, Leland Arthur Deegan, Geraldine Ruth Deegan, Darrel Wayne Saunders and Weinstein are the named defendants. The staged accident occurred on September 11, 1958. One Boisjolie drove the weapon car, Mrs. Deegan the target car. George Barnard was convicted under this count and sentenced to three years, concurrent with his sentence under count I. Weinstein was also convicted, and sentenced to four years.

*Counts VII and VIII.* George Barnard, Ronald Eugene Allison, John Norris Barnard, Charles Harry Geigerich, alias Rich, and Weinstein are the named defendants. The staged accident occurred on August 8, 1958. Geigerich drove the weapon car, Allison the target car. George Barnard was not convicted on these counts. John Barnard was convicted on both counts and sentenced to three years on each, concurrent. Weinstein was also convicted on both counts, and sentenced to four years on each, the sentence on count VII being consecutive to that on count VI, that on count VIII concurrent to that on count VI.

*Count IX.* All named defendants, and nine others, are named in this count. It charges a conspiracy to use the mails to defraud and lists as overt acts the acts stated in the preceding eight counts, plus certain other overt acts in any of which, of the appealing defendants, only George Barnard, Knippel and Lasiter are alleged to have participated. All appealing defendants were convicted on this count, and they were sentenced as follows: George Barnard to four years, consecutive to his sentences on counts I and III, a total of eleven years; John Barnard to three years, concurrent to his sentences on counts VII and VIII, a total of three years; Lasiter to four years, concurrent to his sentence under count III, a total of four years; Knippel the same; Weinstein to four years, concurrent to his sentence under count VII, a total of eight years, plus a fine of $3500.

*COUNT IX, the over-all conspiracy.*

■ Count IX charges that all of the planned collisions and the obtaining of money from insurance companies for real or pretended injuries attributable to the collisions were carried on pursuant to a single plan to do these things. All of the appellants, at the close of the government's evidence, and again at the close of all the evidence, moved for judgments of acquittal on count IX, asserting that there was a variance between that count of the indictment and the proof. They urged that the evidence, at most, showed nothing more than a succession of separate conspiracies to defraud.

We think the appellants are right. The indictment named twenty-eight persons. The indictment charged five planned collisions. There was evidence of a sixth one, not charged in the indictment. The government's evidence shows that of the twenty-eight persons, twenty-two were connected with only one of the collisions mentioned in the evidence; three were connected with two collisions; one was connected with three collisions and one, George Barnard, was connected with five.

George Barnard planned each collision with the group of persons who were to take part in that collision. It might be inferred that his idea was that he would set up a succession of such collisions, since he intended to share in the money extracted from the insurance companies, and he did not intend to be a passenger in any of the colliding vehicles. There was, and in the nature of the case, could have been, no discussion with those designated to ride in the cars that were to be in a particular accident to the effect that the activity in which they were to engage was to be repeated by them at suitable intervals. There is no evidence that any plan that there were to be other collisions, participated in by others than themselves, was discussed with them. The fact that George Barnard may, at the time he talked to a particular small group of persons about their collision, have had in his mind, undisclosed to them, ambitious thoughts about other collisions, does not mean that he was conspiring with them, and they with him, about other collisions which they were not thinking about. There was not a conspiracy for a succession of fraudulent collisions. There was, as the appellants urge, at most, a succession of separate conspiracies, each one about a collision in which the particular group of conspirators was to engage. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 and Rocha v. United States, C.A. 9, 288 F.2d 545 are decisions elaborating the reasons upon which our conclusion is based. None of the convictions of the appellants under count IX can stand.

### THE COUNTS OTHER THAN COUNT IX.

*COUNTS VII and VIII—John Barnard.*

■ John Barnard was a passenger in the target car. There was no direct testimony that he had knowledge of the planned accident. An inference that he did have such knowledge, merely from the fact that he was in the automobile, would not be unreasonable. Other evidence of his association with his brother George, who does not question the sufficiency of the evidence on which he was convicted, was not very convincing. The government made much of the fact that John Barnard had borrowed money from Weinstein on several occasions, one of them two months before the date of the collision in which he was involved, a time when, so far as the evidence shows, no one had even thought of staging a planned collision. In these circumstances we think it possible that he may have been prejudiced by the efforts of the government to involve all the defendants in all the collisions on its theory that there was one over-all conspiracy. We will reverse the conviction of John Barnard, and remand his case to the district court for a new trial. See Kotteakos v. United States, supra.

*COUNTS I-VI—George Barnard.*

George Barnard does not assert that the evidence was insufficient to sustain his conviction on these counts. He does

complain that he was, shortly before the beginning of the trial on September 13, 1961, incarcerated, with bail set at figures beyond his reach, and was thereby prevented from investigating testimony and other evidence and otherwise assisting his court-appointed lawyer in his defense. The facts relating to his incarceration are these: He and the other defendants were indicted on the mail fraud charges on January 20, 1961. Soon thereafter he was released on $2500 bail. The trial was set for May 2, later postponed to the September date in order to give the defendants' counsel more time to prepare. He was out on bail until September 1, 1961, on which day he was indicted and arrested for the alleged intimidation, on February 20, 1961, of a witness who was to testify in the mail fraud case and his bail was set at $50,000, later at $20,000 and finally at $12,000, none of which amounts he could make. On September 5 and 7 motions were made requesting the court to set the intimidation case for trial before the mail fraud case, and the court was advised that the mail fraud case involved fifteen defendants and would require several months of trial. These motions were denied. When a different judge appeared on September 12 for the mail fraud trial on September 13, a motion for continuance was made to him as well as a motion to release Barnard, in the intimidation case, on his own recognizance. These motions were denied. The mail fraud trial began on September 13, and the jury's verdict of conviction came in in November. On December 11, Barnard was tried in a one-day trial on the intimidation charge and was acquitted. Government counsel, during the argument of the September 12 motion to release the defendant on his own recognizance, urged the court to deny the defendant's motion for release on reduced bail or on his own recognizance because, if he should be released, he would use his freedom to approach witnesses in the mail fraud case and he was already under the September 1 indictment for having intimidated a witness in that case.

In this case we have the government, on the very eve of a long trial, obtaining an indictment for another offense which was alleged to have occurred nearly seven months before, and using the indictment, and the impossible bail set under it, for the express purpose of keeping this defendant, though he had only court-appointed, unpaid counsel, from any opportunity to interview witnesses. The fact that George Barnard's trial on the intimidation indictment, when that trial occurred after the mail fraud trial, resulted in an acquittal, indicates that the government might well, during the intervening months between the alleged intimidation and the indictment for it, have further investigated and more accurately appraised the merits of the charge.

■■ Because Barnard was out on bail from January 20 to September 1, 1961, had a highly competent lawyer during that time who knew that the trial was set for September 13 and who represented him at the trial with skill and diligence, because Barnard does not in his briefs point to any specific actions that he might have taken or that might have been taken for him if he had not been incarcerated, because the trial court has a broad discretion in the matter of continuances and in the setting of bail, and because, on the record as a whole, the guilt of George Barnard seems evident, we will not reverse his conviction on the grounds just discussed. (Rule 52(a), F.R.Crim.P.)

*COUNT III—Lasiter and Knippel.*

■ The evidence as to the participation of these two appellants in the events covered by count III was direct and adequate. We do not think that, as to this evidence, there was danger that the jury might have been confused by the overall conspiracy problem.

*COUNTS VI–VIII—Weinstein.*

*1. The Deegan testimony.*

Among the first witnesses presented by the government were Leland Deegan and his wife, Geraldine Deegan. Both testified to having taken important parts in the count VI accident and directly im-

plicated several other defendants, and other persons, in the fraud. They also gave testimony which, as the government contends, implicated Weinstein, a Portland lawyer.

In the investigation which preceded the indictment in this case, Mr. and Mrs. Deegan were questioned by Mr. Severtson, a United States postal inspector. He told them in effect that he had enough evidence to indict them, and that they had their choice of sitting on one side of the table with those who testified against Weinstein or sitting with those who got indicted. By this time Severtson had a full confession from one Boisjolie, obtained on October 10, 1960, which implicated not only the Deegans, but several other persons. It would seem that, at this stage of the investigation, the investigators knew nothing about a possible connection of Weinstein with the criminal conduct except that he had been the lawyer for the Deegans and for some others who claimed to have been hurt in the planned accidents. The investigators thought, logically enough, that since the Deegans had been in frequent contact with Weinstein during the more than a year in which their claim was pending, they could testify to things which Weinstein had said or done which would show guilty knowledge on his part. That would seem to have been the reason for the threat that if they did not make a statement accusing Weinstein, they themselves would be indicted.

The Deegans denied any wrongdoing, or any knowledge of any wrongdoing, both to the investigators and to the grand jury before which they were called. They were indicted, with the other defendants, on January 20, 1961. They pleaded not guilty and each of them was released on $500 bail. They went to Bend, Oregon, some two hundred miles from Portland, where Deegan secured employment as a player in a small orchestra, and his wife as a cocktail waitress, in the same tavern.

On July 15, 1961, Boisjolie drove to Bend, Oregon. At this point we insert testimony offered, but objected to and ex-cluded, erroneously, as we shall explain later. Boisjolie went to the place where the Deegans were employed. In response to questions asked by the Deegans as to how he happened to be there, he said he had just come to have some fun. He told the Deegans that he had confessed, and had testified before the grand jury. The Deegans had not known this. He asked Mr. Deegan what he was going to do, and Deegan said he was not going to plead guilty. Boisjolie, after a day or two, left Bend.

On September 1, 1961, the government's special prosecutor, who was in charge of the mail fraud case, obtained a secret indictment of Mr. Deegan for the offense of having intimidated a witness, Boisjolie, in an attempt to affect the administration of justice. On that same day, two FBI men went to Bend to arrest Deegan. Deegan was playing in the orchestra. The FBI men arrested him on the bandstand, interrupting the playing of a number. He was barely allowed to say goodbye to his wife. He was taken, that same night, to Portland by the FBI agents. His bail was set at $50,000 and he was lodged in Rocky Butte jail, outside of Portland. The Deegans' attorney in the mail fraud case had left Portland for a coast resort for the Labor Day weekend and did not return to Portland until Tuesday night, September 5. As late as September 7 Deegan told his attorney that he was innocent and wanted to go to trial. On the night of September 7, two FBI men talked to Deegan in the jail for three hours or more, at the end of which time he signed a statement for them, and concluded that he wanted to plead guilty. On September 8, from the courthouse where Deegan had been taken, his lawyer was summoned. He advised the court that he knew nothing about the change in Deegan's attitude. Judge Solomon questioned Deegan carefully as to whether his plea was made voluntarily and with understanding, and received affirmative answers. The plea was accepted.

On the same day, September 8, the court, which had, on the preceding day,

reduced Deegan's bail on the intimidation charge from $50,000 to $20,000, reduced it to $2,500. By communication with Deegan's wife at Bend, and diligence on her part, $250, enough to pay the bondsman for the $2,500 bail, was raised, and Deegan was free by eight o'clock on the night of September 8. Mrs. Deegan, on September 12, pleaded guilty to the mail fraud charge. The trial of the defendants who had not pleaded guilty began the next day, September 13.

Deegan was never arraigned on the intimidation charge. On the day that the defendants in the mail fraud case were sentenced, February 7, 1962, Deegan was released on his own recognizance in the intimidation case, and the cash bond of $2,500 was refunded. On March 13, 1962, on the motion of the government's Special Prosecutor, the intimidation charge against Deegan was dismissed for the reason that he had pleaded guilty in the mail fraud case.

Thus ended the intimidation prosecution. It started with a still unexplained journey of the victim, Boisjolie, to a place two hundred miles distant where apparently he accomplished nothing except to get intimidated; evidence that he did not even accomplish that was erroneously excluded; six weeks later, on the eve of the mail fraud trial, Deegan was indicted for the alleged intimidation; the FBI agents rushed to the place where the indicted man could be found, with as much alacrity as if Deegan had been No. 1 on the list of ten most wanted; they got their man even though it required the interruption of the orchestra and the dance; they got him securely lodged in jail without delay; and the prosecution got his bail set at $50,000. To a small-time criminal like Deegan, whose only previous federal conviction was for the interstate transportation of a stolen automobile, and who was then out on $500 bail on a mail fraud charge, the experience must have been shattering.

On September 8, when Judge Solomon accepted Deegan's plea of guilty, he voiced his suspicions to the Special Prosecutor as follows:

"If this is not a proper charge, (the intimidation charge), I think it should be dropped against him. If it is a proper charge, I think that the government should go ahead and prosecute him. I can tell you that I would have been less enamoured of the case had I known from the start that the witness who was alleged to have been intimidated went from Portland, Oregon, to Bend, Oregon, where he was intimidated. Now, it may very well be that he was still intimidated, but that puts a different picture on it."

In spite of this pointed observation by Judge Solomon, the Special Prosecutor neither dropped the charge nor prosecuted it. He just kept it hanging over the Deegans, who were, within less than a week, to be his first important witnesses in the mail fraud trial, and his most important witnesses against Weinstein. The Special Prosecutor himself said that in view of what Deegans' lawyer told him about the lack of substance in the intimidation charge, he would restudy the charge. If he did restudy it and found it to be without substance, he did not act upon that knowledge until many months after the Deegans had testified in the mail fraud case. His study should have occurred after Boisjolie reported on his July 15 journey to Bend, and before he asked the grand jury for the September 1 indictment and before the FBI agents were sent on their urgent errand to Bend.

We think the government should have sensed the danger that it might get more from the Deegans than it could, in decency, accept. The Deegans, who had been free on a mere $500 bail on the well-founded mail fraud charge, had been suddenly confronted by a wholly different kind of attack by the government. This time Deegan had been summarily arrested for doing nothing at all, had been carried off two hundred miles to prison, and put under $50,000 bail, which was one hundred times larger than that for the mail fraud crime which he had in

fact committed, and had no prospect of any future except a future in jail, with a trial and conviction and more imprisonment to follow. There was danger that a character like Deegan might well conclude that if the government can do these things to you, and you can escape your plight only by giving the government what it wants, you will give the government what it wants. So the Deegans made their statements, became the first important government witnesses, and the principal witnesses who gave testimony upon which the government relies to sustain the conviction of Weinstein. When they testified, both were awaiting their sentences in the mail fraud case in which they were giving testimony, and Deegan was still facing trial and possible sentence on the intimidation charge.

 It should be noted here that the long interrogation of Deegan by FBI agents in the jail on the night of September 7, resulting in his signing of his confession, and followed on the next day by his plea of guilty, was in violation of his constitutional right. Massiah v. United States, 1964, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. Since the Massiah doctrine was not announced until 1964, the interrogation by the FBI agents was not a knowing violation of the Constitution. Nevertheless, the statement which Deegan made could not have been used against him, if he had not pleaded guilty and had been put on trial in the mail fraud case.

 Weinstein offered to prove that the intimidation charge was a bogus charge, which some overzealous person had put over on the prosecutor. The offer was denied. This was error. The court should have permitted full exposure of the events which took place at Bend, Oregon, on July 15 and on September 1, 1961, and in the Rocky Butte jail on the night of September 7, 1961. Evidence tending to show a substantial reason for bias or interest in an important witness is never collateral or irrelevant. It may be, and we think it would have been in this case, the very key to an intelligent appraisal of the testimony of the Deegans. We recognize that, as to the witness Deegan, there may have been a plausible claim of a privilege against self-incrimination as to the events of July 15, although truthful testimony would probably not have incriminated him at all. As to Mrs. Deegan, however, there was no valid reason for cutting off her examination.

### 2. The sufficiency of the evidence.

 At the least, then, Weinstein is entitled to a new trial. He earnestly contends that the evidence is insufficient to sustain his conviction on any of the three substantive counts. In appraising the evidence, we apply the test adopted by this court in Kaplan v. United States, 1964, 329 F.2d 561, 563, viz., "whether 'reasonable minds could find that the evidence excludes every hypothesis but that of guilt.' " [1] This refers to the minds of the jury; we do not retry the case. We assume that the jury believed the Deegans and the other government witnesses. It is for the jury, not this court, to decide what witnesses to believe. It is for the jury, not this court, to draw whatever inferences may legitimately be drawn from the evidence that they believe. We are required to consider the evidence in the light most favorable to the government.[2] Having done so, it is still our duty to reverse if we find that the evidence does not meet the test laid down by us in Kaplan, supra.

---

1. See also Byrnes v. United States, 9 Cir., 327 F.2d 825, 829–830, note 5a; Woxberg v. United States, 9 Cir., 329 F.2d 284.

2. Kaplan v. United States, supra, and cases there cited; Peek v. United States, 9 Cir., 1963, 321 F.2d 934; Lyda v. United States, 9 Cir., 1963, 321 F.2d 788; Proffit v. United States, 9 Cir., 1963, 316 F.2d 705; Butler v. United States, 9 Cir., 1962, 310 F.2d 214; Toles v. United States, 9 Cir., 1962, 308 F.2d 590; Miller v. United States, 9 Cir., 1962, 302 F.2d 659; Schino v. United States, 9 Cir., 1954, 209 F.2d 67; Papadakis v. United States, 9 Cir., 1953, 208 F.2d 945; Banks v. United States, 9 Cir., 1945, 147 F.2d 628.

Our statement of the evidence is based upon the statement of it in the government's brief, insofar as it is supported by references to the transcript and the exhibits. (Some references do not support the government's claims.) We presume that the government has stated its case as strongly as it can. It will be remembered that count VI deals with a September 11, 1958 accident. Mrs. Deegan drove the target car; passengers were her husband and one Saunders. One Boisjolie, accompanied by one Howerton, drove the weapon car. Counts VII and VIII deal with an August 18, 1958 accident. One Geigerich drove the weapon car; one Allison the target car. John Barnard and one Page were passengers in the latter. We first consider the evidence that directly relates to these counts.

*Count VI.* Following the accident, Saunders was taken to Providence Hospital. He was placed in the same room with one Field, a client of Weinstein's, and at Field's suggestion called Weinstein, who came to the hospital. At that time Weinstein advanced two or three hundred dollars to Saunders. He undertook to represent Saunders. While the matter was pending, he advanced some $1080 to Saunders, some of which was for bills for the hospital, ambulance and clinic. Weinstein was reimbursed from the settlement. Saunders told Deegan that he was not hurt. Weinstein referred Saunders to a Dr. Davis for examination. By the time the matter was settled, Saunders had left Portland. Weinstein, being unable to locate him, simulated Saunders' signature on the release, witnessed it, and signed Saunders' name on the draft. He claims that he did this pursuant to a power of attorney given him by Saunders. This he produced at the trial. By the time the doctors, the hospital, Weinstein's loan, his fee, and court costs were paid, little was left for Saunders.

The Deegans were not hospitalized. They were referred to Dr. Davis and to Weinstein by George Barnard. Weinstein told Mrs. Deegan not to work, as it would not look right for her to work with a back injury. Weinstein told Deegan to stay off work, and sent Deegan to buy himself a back brace, and instructed him to send the bill to Weinstein. It was the doctor who told Deegan to get the brace. Deegan refrained from working from September, 1958 to March, 1959, because Weinstein told him not to work. Weinstein instructed the Deegans as to what injuries they were supposed to have, and how to act when examined by a doctor. He referred them to a second doctor, being dissatisfied with Dr. Davis' report. He inspected their car, decided that it was not sufficiently damaged, and told Deegan to bash it into a tree, which he did. A commercial photographer took pictures immediately after the accident. When Weinstein saw the pictures, he told Deegan to get rid of the car—to junk it out.

Weinstein signed and filed court complaints for the Deegans, alleging back and neck injuries. He financed the Deegans after the accident, to the tune of about $1200. When the matter was settled, it was George Barnard, not Weinstein who told the Deegans that the checks were at Weinstein's office. Weinstein asked the Deegans to say that one Irene Blair, not George Barnard, had referred them to him. The Deegans' case was settled for $3700. Weinstein's fee was $1100. When the investigation leading to the indictment began, Weinstein gave Deegan money, and told Deegan to get his wife out of town. The Deegans went to Seattle.

*Counts VII and VIII.*

John Barnard had previously been represented by Weinstein, who advanced money to him on July 7 and 22 and August 8, 1958. The accident was on August 18. Weinstein represented him. Geigerich, the driver of the weapon car, gave various false addresses to the police, the hospital, and an insurance adjuster. Yet Weinstein knew his correct address and sent him a letter.

Certain other testimony, not all of it directly related to these accidents, must

also be considered. Weinstein had known George Barnard, who appears to have been the instigator of each plot, since 1957. He handled at least two other cases for Barnard, one arising in January, 1958 and one in February, 1959. He advanced considerable sums to Barnard. The record contains checks from Weinstein to Barnard, as follows:

| Date | Amount |
| --- | --- |
| January 25, 1958 | $50.00 |
| January 28, 1958 | 100.00 |
| January 31, 1958 | 100.00 |
| February 3, 1958 | 50.00 |
| February 6, 1958 | 50.00 |
| February 8, 1958 | 50.00 |
| February 13, 1958 | 300.00 |
| May 22, 1958 | 200.00 |
| June 6, 1958 | 300.00 |
| August 16, 1958 | 100.00 |
| March 6, 1959 | 350.00 |
| March 30, 1959 | 300.00 |
| August 25, 1959 | 300.00 |
| October 21, 1959 | 200.00 |

There were also cash advances, including one in October, 1958. Between December, 1958 and July, 1959, George Barnard came to Weinstein's office about once a week. He got $575 on September 16, 1958, in settlement of the January, 1958 accident. On July 9, 1958, George Barnard bought a 1941 Chevrolet for $100. This was the target car in the count VI accident. On August 21, 1958, George Barnard bought a 1951 Oldsmobile. This was the weapon car in the same accident. George Barnard referred McCoy (a count IV participant), to Dr. Davis and to Weinstein. Both before and after the count VI accident, George Barnard told Mrs. Deegan that arrangements had been made concerning doctors and attorneys, mentioning Dr. Davis and Weinstein. Weinstein also advanced money to McCoy, to Kerr (a participant in a January 17, 1959 accident), and to Rose (a participant in the count IV accident), to Knippel and to Lasiter. He represented Boisjolie (a count IV participant), in connection with another matter, and in a divorce, as well as Lasiter in 1958 and 1959 in other cases. After the count III

accident, Knippel went to Weinstein who referred him to his associate, Gray. McCoy, Rose and Kerr went to Weinstein, but were also referred by him to his associate, Gray. Nevertheless, Weinstein continued to finance them. Some of the advances were by check, some in cash. Weinstein also financed Woolrige (a participant in the January 17, 1959 accident). George Barnard paid Swertfeger, alias Scott, $500 to drive the count IV target car, and referred him to Weinstein. Weinstein told McCoy and Rose to say that they had been referred to him by one Svilar. Weinstein told Rose that he had heard talk that the count IV accident was phony, or fixed.

One Perrin, an insurance adjuster, testified that on October 19, 1960, he and Weinstein discussed the case of an attorney who was involved in disbarment proceedings. Weinstein said: "I am not an attorney. I am just a banker. You never saw a banker go to jail, did you? They will never get me. They will get some of the small fry in this matter, but they will never get me." On cross-examination, Perrin testified that he did not take the remark seriously; "we were semi-kidding about the thing."

In answer to all of the foregoing, Weinstein asserts that he, too, was a victim, that he did not know or suspect that the accidents were staged, and that the proof fails to disclose that he did know. He offered extensive character testimony, which was not attacked by the government. And he offered testimony by reputable Portland attorneys that it was customary for Portland lawyers for plaintiffs to finance their clients as he had done.

Obviously, the evidence does not *compel* a conclusion of guilt. As to counts VII and VIII, we are of the view that it is insufficient to *permit* reasonable minds to find that it excludes every hypothesis but that of guilt. As to count VI, however, we believe that reasonable minds *could* so conclude, *if they believed the Deegans*. Without their testimony, we think that the evidence would be insufficient. What we have already said in-

dicates that we have grave doubts as to the Deegans' veracity, and that we are shocked at the government's treatment of them in its effort to get the testimony it wanted. Nevertheless, it is conceivable that the pressure to which they were subjected caused them to tell the truth, rather than to lie, and that a jury, with the whole story before it, would still believe them. Cf. Lemons v. United States, 9 Cir., 1964, 339 F.2d 761.

■ In our opinion, the foregoing evidence would justify a jury in concluding, from the relationship between Weinstein and George Barnard and of Barnard to the accident, from the fact that Weinstein advanced moneys to persons who were no longer his clients, from the fact that some of Weinstein's advances were to persons who did not then have cases pending in his office, from what Weinstein did in relation to the Deegans and from what Barnard did, that Weinstein was in fact a party to the faking of the accidents to which count VI relates. The jury was not required to believe Weinstein's denials or to find that the manner in which Weinstein was advancing money to Barnard and to some of the others was similar to that referred to by the Portland attorneys who testified as to the custom of financing personal injury clients.

We think it no answer to say that Weinstein's reputation was apparently good, that he handled a large number of cases as to which no question has been raised, or that it is not conceivable that a man in his position and of his intelligence would risk so much for so little by trying to add to an already large income through participation in these fraudulent cases, which could not be expected to produce large returns. Many a man of fine reputation has descended to criminality. If Weinstein did the things that the Deegans say he did, then those who testified as to his reputation must have been, to say the least, incompletely informed about him. Many criminals are still honest in most of their transactions. And cupidity plays strange tricks upon probity, calculation and intelligence. All these matters are for the jury.

■ We do not agree that the Deegan testimony should be excluded. Every exclusionary rule, while it may be a barrier to deception in one case, may be a barrier to truth in another. We are reluctant to create a new one. Competent counsel, with the full story of the government's treatment of the Deegans before the jury, may well be able to convince the jury that they should not be believed. This opportunity, we think, is all that Weinstein is entitled to.

3. *The refusal of the court to require the delivery to Weinstein of certain documents.*

■ Weinstein asserts that the court erred in denying him access to certain documents. One of these was an FBI report of an interview with a witness, Hart, in November of 1958. Another was a thirty page statement given by the same witness to government agents in July of 1960. The third was a statement given by the witness Geraldine Deegan on September 12, 1961. The court denied access to the first statement, excised portions of the other two, and ordered the balance of those two statements delivered to Weinstein. We have examined the first statement and the portions of the other two statements that the court sealed, and we conclude that no error was committed. We add, however, that if Weinstein is tried again, and if the same witnesses testify, the trial court should re-examine the matter and, if it thinks that delivery of the first statement or portions of it to Weinstein's counsel, or of some or all of the excised portions of the other two statements, would be proper under the rules laid down by the cases, it should require such statements to be delivered. We think that, in general, the courts should be liberal in causing the delivery of such statements to defense counsel. It may well be that with the lapse of time and the disposition of the case against the other defendants, the government will be willing to produce the statements *in toto*.

*The time allowed for oral argument in the district court.*

The appellants all assign as error the time limitations imposed upon them by the district court for the oral arguments of their counsel to the jury. They say that because there were ten defendants, one hundred and nine witnesses, and four hundred and seven exhibits, the time allotted made it impossible for their counsel to adequately argue their cases to the jury. As to Weinstein and John Barnard, the problem will be quite different on a new trial. As to the other appellants, the numbers just recited are not very significant. As to each defendant, the numerous witnesses from the insurance companies, the hospitals, the banks, etc. did not testify to anything which could be usefully argued to the jury. The same is true with regard to practically all of the numerous exhibits. As to each defendant, the principal theme which he could have usefully argued was the credibility, and the consistency, of the testimony of the small number of witnesses who had testified that he took some part in planning or executing one of the collisions. George Barnard, because he was accused of participating in several of the planned events, was allowed sixty minutes by the court. His counsel used only twenty minutes. Much can be said in sixty minutes, certainly much more than in twenty minutes. We think this appellant has no ground for complaint in this regard. The other appellants each had thirty minutes, which were largely but not entirely used. A trial court has, of course, wide discretion in the allotment of time for argument. We do not find misuse of that discretion, and hence we find no error, in this regard.

*The juror problem.*

The appellants George James Barnard, William Lasiter, John Barnard and Raymond Knippel made motions under Rule 33 of the Federal Rules of Criminal Procedure for new trials upon the ground of newly discovered evidence concerning the qualifications of two of the twelve jurors who sat in this case. The motion was denied, the appellants brought the question to this court which on January 14, 1963, remanded the case to the district court for the holding of a hearing on the motion. Such a hearing was held in February and March, 1963, witnesses were heard, and the district court on August 1, 1963, entered its order denying the motion. The court made findings of fact and conclusions of law and wrote an opinion. These writings accompany the court's order in the record. The court's conclusions of law were, in substance, that the evidence concerning the two jurors, upon which evidence the appellants relied to support their motion, was not newly discovered; that the appellants waived their right to challenge the two jurors; that the jurors were not disqualified from service by any fact developed at the hearing on the motions; that there was no failure by the jurors to disclose any material fact bearing upon their qualifications; and that there was no prejudice to the appellants by reason of the circumstances developed at the hearing on the motion.

The court's findings are supported by the evidence, and its conclusions of law are supported by its findings. We find no error in the denial of the motion for new trial.

We think that other errors assigned do not require discussion by us.

*Conclusions.*

We reverse the judgment against the defendant Philip Weinstein, on counts VII and VIII of the indictment, and direct that those counts of the indictment be dismissed as to him.

We reverse the judgments against the defendants Philip Weinstein, George James Barnard, William Mack Lasiter, John Norris Barnard and Raymond Knippel on count IX of the indictment, and direct that that count of the indictment be dismissed as to them.

We reverse the judgment against the defendant Philip Weinstein on count VI of the indictment and remand his case to the district court for a new trial on that count.

We reverse the judgment of conviction of John Norris Barnard on counts VII and VIII of the indictment, and remand his case to the district court for a new trial on those counts.

We affirm the judgment against George James Barnard on counts I, II, III, IV, V and VI of the indictment.

We affirm the judgment against William Mack Lasiter on count III of the indictment.

We affirm the judgment against Raymond Henry Knippel on count III of the indictment.

Affirmed in part and reversed in part.

MADDEN, Judge (dissenting in part):

I dissent from that part of the decision which, after reversing the conviction of the appellant Weinstein on Count VI of the indictment, remands the case to the District Court for a new trial on that count. In my view that count of the indictment should be dismissed.

### I

The court's opinion makes clear that, except for the testimony of the Deegans, Count VI would have had to be dismissed. The first ground of my dissent is that, in my opinion, the testimony of the Deegans was inadmissible.

The court's opinion says, of the Deegans, "[W]e are shocked at the government's treatment of them in its effort to get the testimony it wanted." It recognizes that the long interrogation of Deegan in the jail by F.B.I. agents when Deegan was under two indictments and was without counsel was a violation of Deegan's constitutional rights, and that the statements and promises which the F.B.I. got out of Deegan would not have been admissible against him if the government had had to try him. The court's opinion, after reciting the tactics by which the government got the Deegans' evidence, says, "What we have already said indicates that we have grave doubts as to the Deegans' veracity * * *."

When one remembers that, in the numerous cases in which admissions have been obtained, or other evidence has been obtained, by unconstitutional tactics, the courts have regarded the question of veracity as quite irrelevant, and have simply said that if the government gets evidence that way, it can't use it, even though it is demonstrably true, one might expect that this court, in its statements which I have recited in the preceding paragraph, was leading up to some significant conclusion. But it was only leading up to the non sequitur that the evidence was admissible. The court disposes of the problem by saying:

> "Every exclusionary rule, while it may be a barrier to deception in one case, may be a barrier to truth in another. We are reluctant to create a new one."

The reaction of the prosecutors and police to this decision will be that it doesn't hurt a bit. They were not bludgeoning Deegan to get evidence against Deegan. They already had plenty of evidence against Deegan. But as to Weinstein, they were away out on a limb. They had indicted him in January, without evidence. The trial was set for September 13 and it was now September 7 and they still did not have any evidence. By coercion and obviously implied inducements they got what they desperately needed, they were allowed to use it; it was, as this court says, the only evidence on which a conviction could have been based, and they got the conviction.

The court may be right in saying that to exclude this evidence would be to create a new rule of exclusion. But the philosophy and reason for the exclusion would not be new at all. If the courts assume responsibility for saying to the prosecutors and police that if they get evidence by unconstitutional means they can't use it in court, what possible difference does it make whether they use it against Deegan or against Weinstein?

### II

The court quotes its opinion in Kaplan v. United States, 329 F.2d 561, 563, wherein the standard to be applied by the

court in reviewing the evidence of a conviction in a criminal case is said to be "whether 'reasonable minds could find that the evidence excludes every hypothesis but that of guilt.'" This means, of course, that the court assumes the task of appraising and weighing the evidence, as judges, and with the wisdom and experience of judges. It does not mean that the judges should try to assume the posture of lay jurors exposed to the conflicts and confusions of a long-drawn conspiracy trial of ten defendants, and to determine what mistakes on the part of the jury might be reasonably excusable in those circumstances. The judges are not exposed to those conflicts and confusions. They have the opportunity and the duty, in the course of a deliberate review of the evidence, to determine what part of the evidence has relevance to the charges against this one or that one or more of the ten defendants on trial in a case such as the instant one. Mr. Justice Jackson in his concurring opinion in the case of Krulewitch v. United States, 336 U.S. 440, 454, 69 S.Ct. 716, 723, 93 L.Ed. 790 said:

"A co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together."

The court, in its opinion, shows no recognition of this important aspect of the instant case, or of the inherent danger of an unjust verdict. The evidence in the case showed that there had been much serious criminality in connection with these faked automobile accidents, and that this criminality had escaped detection for many months. The jury may well have concluded, as the Postal Inspector must have done, that since the other defendants were not very intelligent, there must have been a master mind, a Fagin, behind all this business. Weinstein was highly intelligent and experienced, he handled the personal injury claims of several of the criminals, he must have been the master conspirator. The jury would find it hard to believe what is easy for us to understand, that a lawyer does not, without reason, suppose that one who brings to his office what is represented to be a personal injury case is in fact a criminal who purposely injured himself in order to cheat an insurance company.

## III

I shall now disregard the tactics by which the government obtained the testimony of the Deegans, and analyze that testimony to see what is really in it. The Deegans planned the accident, under the direction of George Barnard. He told all the intended participants that the police, the hospitals, the doctors and the lawyers were "fixed." The collision occurred as planned. George Barnard told the Deegans to go to Dr. Davis and to Lawyer Weinstein. The morning after the accident they went to Dr. Davis. They told him they had been in an automobile accident, had been struck from the rear, and that their necks and backs were hurt. Dr. Davis examined them, treated them for the injuries which they said they had, did not accuse them of having injured themselves or of lying to him about their pains. Dr. Davis has not been charged with, nor suspected of, being in a plot to help the Deegans cheat an insurance company.

The Deegans went from Dr. Davis to Lawyer Weinstein. They told him the same things they had told Dr. Davis. He made notes of their statements, and agreed to take their case. He is under indictment for having plotted with them to cheat an insurance company. The mere fact that Weinstein is a lawyer and Davis is a doctor can hardly be enough to make the difference between ordinary professional conduct, on the one hand, and criminality on the other. So we must look farther for evidence of Weinstein's criminality.

Weinstein handled the Deegans' cases routinely. There was no pressure for a quick settlement, as if he suspected that

investigation might undermine their claim. More than a year was spent in negotiation, the taking of depositions, examination by insurance company doctors, etc. During the more than a year between the accident and the settlement the Deegans, or one of them, was in Weinstein's office about once a week inquiring about when they would get their money. During the constant contact between the Deegans and Weinstein, not once, according to the testimony of the Deegans, did Weinstein show any recognition whatever that the Deegans' collision was a planned one. The Deegans were government witnesses, whose testimony had been obtained, as the court's opinion shows, by oppressive and illegal tactics, who, on the witness stand, were still completely at the government's mercy, since they had not been sentenced on their pleas of guilty on the mail fraud charge and Deegan had not been tried on the intimidation charge. There is no possible reason why the jury, or this reviewing court, should disregard this important testimony of the Deegans. And it puts the government in the almost ludicrous position of charging Weinstein of plotting for more than a year with the Deegans to cheat an insurance company by means of a planned accident, and having the Deegans, as government witnesses, testify that it was their opinion that Weinstein was not aware that he was plotting with them. I suggest that this situation, if it is conceivable at all, is barely so, and that it is at the opposite pole from what a reasonable mind could find, beyond a reasonable doubt, to exist.

What I have discussed in the preceding paragraph is not mentioned in the opinion of the court.

It may be urged that, though proof of guilty knowledge on Weinstein's part is absolutely essential to the government's case, and though its own witnesses have strongly contradicted such proof, there must be, in the case, other cogent evidence to contradict the contradiction. But no one really claims that there is other cogent evidence. Looking farther, we find much evidence that Weinstein advanced money to the Deegans and some other persons guilty of the planned accidents, and repaid himself for the advances out of the settlements when they occurred. If we *assume* the very point which is at the heart of the case, i e., Weinstein's guilty knowledge, then the advances were in furtherance of the plot, and were relevant. But unless we perform this perfectly boot-strap levitation, the advances prove exactly nothing. The evidence is clear and uncontradicted that in Portland at the time here involved it was customary for reputable lawyers, if they pleased and were able to do so, to advance money to personal injury clients on the security of their expected settlements. We saw that, in the case of Dr. Davis and Lawyer Weinstein, the difference between respectable professional conduct and criminality was the difference between being a doctor and being a lawyer. In regard to advances to clients, the difference becomes even less explicable. It is the difference between Lawyer Weinstein and all the other lawyers in Portland.

The court, in concluding that reasonable minds might find guilt beyond a reasonable doubt in the instant case, recites numerous instances of Weinstein's advances to clients. I suggest, with deference, that these instances are evidence of nothing whatever that is relevant.

My analysis of the Deegans' testimony, up to this point, seems to me to have left the government's task of proving Weinstein's guilty knowledge of the planned accident a substantial distance below zero. So we are still on the lookout for cogent evidence. At this point I am reminded of the statement in the court's opinion that " * * * we have grave doubts as to the Deegans' veracity * * *." I share those doubts, but I shall assume that their testimony is true, for the purposes of the discussion. They testified that Weinstein demonstrated to them how to pretend that they could not bend more than a certain distance in various directions, when they were being examined by doctors. Our question is whether this testimony, if believed, would

tend to show that Weinstein knew that the collision in which they took part was a planned accident. Would the fact that a lawyer would coach his clients who had been in a rear end collision and who had told him that they suffered invisible injuries to their necks and backs tend to show beyond a reasonable doubt, or to any degree whatever, that that lawyer knew that their collision was a planned collision? Does the fact that the injury which his client claims to have was received in a genuine accident rather than in a planned accident have any logical relation to what an unscrupulous lawyer would do in the way of illegally coaching his client? Would the fact that a lawyer had embezzled money from another client be admissible to show that he plotted with this client to participate in a planned automobile accident?

Mr. Deegan testified that, within a day or two after the collision, Weinstein saw Deegan's automobile, which was little damaged in the rear end, and told him to take the automobile out and bash it into a tree, which Deegan did. I shall here depart from my assumption that the Deegans' testimony was true. Uncontradicted documentary evidence showed that ten days after the accident Weinstein ordered, from a commercial photographer who hurried to the scenes of accidents to take pictures to sell, a photograph of the Deegan car. It would have been unbelievably irrational for Weinstein to have done this if Deegan's testimony were true. But taking it as true, what I have said above about coaching the Deegans for their medical examination would be applicable. It would be a case of exaggerating damage, and the fact that the collision had been planned or unplanned would have had no relevance.

Deegan testified that in 1960, which was two years after the accident, he told Weinstein that his, Deegan's wife had indicated that she might "talk," and he asked Weinstein for advice and Weinstein told him to get her out of town and at Deegan's request loaned Deegan money for that purpose. Assuming the truth of this testimony, Weinstein must have known by that time that the Deegans were in serious trouble. It is not surprising that he would have known, since the investigation, involving a score or more of people, had been going on for some time. The Deegans had not been subpoenaed and were not under any legal duty either to confess their crime or to keep themselves available for questioning, and for Weinstein to tell Deegan that was neither criminal nor otherwise wrongful. But our question is whether his doing so is evidence that he was a participant with them in the crime which was under investigation. I suggest that, of itself, it is not evidence at all of anything but what appears on its face, that is, of advice to a client for the client's benefit, unless the lawyer's participation in the crime is proved by other evidence.

We look at Weinstein's career and his character. He had started with nothing, had, solely by his own efforts, attained membership in the legal profession. His practice had become large and prosperous. It was the kind of practice in which, often in the earlier years, some lawyers do unscrupulous things in order to pay their bills and support their families. In spite of the zeal with which the government sought for evidence against Weinstein, it was unable to discover a whisper to discredit his character. Persons of unquestioned integrity and distinction were readily found who testified for him, and many others were similarly ready but were not heard because their testimony would have been cumulative. Then, we are asked by the government to believe, this man all at once became a contemptible scoundrel, soiling the robes of his honorable profession and the distinguished status which he had achieved in it by becoming a common criminal, and putting in jeopardy every good thing which he had attained in his entire career. And all of this for what purpose? The only possible motive would have been avarice, a desire to have three more law-suits in his office. But he already had 106 law-suits in his office, and was having to refer some of them to other lawyers because he had too

many. And was he supposed to have lost, in addition to all moral principle and sense of decency, also his common sense and judgment? What mature man of Weinstein's intelligence and experience would have thought for a moment that this criminal conduct could have failed to be discovered or could have led to any financially profitable result? Each of 27 persons took part in the planning or execution of one or more of the harebrained exploits. In small groups they made their plans, usually over their drinks in taverns. It was inevitable that there would be, as there was, talk, investigation, and exposure.

I think the court's treatment of the problem just discussed is not adequate. The court says, "And cupidity plays strange tricks upon probity, calculation and intelligence." I think that when it is necessary to conjure up strange tricks, as in this matter of a catastrophic change of character, or to believe the almost unbelievable—that the plotters were not aware that they were plotting—the prosecution should have for counter-weight to point to some solid evidence of guilt. In my opinion, it has presented no such evidence.