**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Harry P. HUTUL, Robert Sacks, Herbert Basan, Nancy Mitchell, and Vito Lombardi, Defendants-Appellants.**

**Nos. 15952–15956.**

United States Court of Appeals
Seventh Circuit.

Sept. 9, 1969.

Certiorari Denied Jan. 12, 1970.
See 90 S.Ct. 573.

Charles A. Bellows, Jason E. Bellows, Sherman C. Magidson, John R. Sullivan, Warren D. Wolfson, Milton Blum, John J. Cleary, Chester T. Kamin, Kenneth J. Burns, Richard E. Gorman, Chicago, Ill., for appellants; Bellows, Bellows, & Magidson, Chicago, Ill., of counsel.

Thomas A. Foran, U. S. Atty., Michael B. Nash, Asst. U. S. Atty., Chicago, Ill., for appellee; John Peter Lulinski, Asst. U. S. Atty., of counsel.

Before CASTLE, Chief Judge, and CUMMINGS and KERNER, Circuit Judges.

CASTLE, Chief Judge.

On July 9, 1964, the Grand Jury filed a sixteen-count indictment against the defendants-appellants and three others,[1] charging them with defrauding by use of the mails, various named insurance companies by means of knowingly false pretenses and representations, between January 1, 1959 and January 1, 1962. Each of the first fifteen counts charged the defendants with violations of 18 U.S.C. § 1341 (mail fraud) and Count 16 charged them with conspiracy to violate § 1341, in violation of 18 U.S.C. § 371. Counts 1, 2, 10, 11 & 14 were dismissed on the motion of the Government. The various defendants were convicted of certain of the remaining counts.[2]

---

1. Frank Ciconti, Lawrence Schwerdlin, and Alan D. Wolfe. Defendant Schwerdlin died before trial commenced. Defendant Ciconti was dismissed and Defendant Wolfe was directed out at the end of the Government's case.

2. Defendant Hutul was found guilty on counts 3, 4, 6, 7, 8, 9, 12, 13, 15, and 16; not guilty on count 5. Sacks was found guilty on counts 3, 4, 7, 8, 9, 12, 13, 15, and 16; not guilty on counts 5 and 6. Basan was found guilty on

Each defendant, except Mitchell, was sentenced to five year concurrent prison terms on each count on which he was convicted. Mitchell was sentenced to concurrent one year terms on counts 3 and 7, and to two years probation to commence at the termination of such terms.

The indictment concerned six alleged automobile "accidents" and claims for lost wages allegedly resulting from injuries sustained therein.[3] The alleged fraudulent representations and their antecedent circumstances followed a similar pattern in each instance and involved the use of the mails in the transmittal of the claims and data furnished to support them.[4] This will be detailed more fully in the summaries hereinafter made of the record disclosures concerning each of the "accidents" and the resulting claims. In some instances the defendants were successful in securing settlements from the insurers involved.

The nature of the contentions advanced by the defendants on appeal necessitates a discussion of each "accident," the alleged parties thereto, and the representations made thereof, as disclosed by the evidence taken in the light most favorable to the Government. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

*Accident No. 1.* The first accident which was the subject of a count of the indictment occurred in Chicago, Illinois, on April 4, 1959, between a truck which had been rented that day by Alan Wolfe and insured by Allstate Insurance Company, and a car driven by Frank Ciconti. That evening Wolfe returned the truck to its lessor, Big City Express, whose owner noticed little or no damage to the vehicle.

Prior to this incident, an application for a driver's license had been filed by someone who identified himself as Vito Iosco, and a temporary permit was issued.[5] This permit was used that same day in connection with the opening of a bank account at the Franklin Park Bank in the name of Vito Iosco, and the next day Marie's Answering Service was employed in the name of Anthony Iosco. Both Ioscos gave the same address: 1108 23rd Avenue, Melrose Park, Illinois.

On April 9, 1959, Defendant Hutul filed an attorney's lien with Wolfe and Big City Express, stating that he represented six claimants: Frank Ciconti, Laura Young, John Janus, Michael Birdcill, Herbert Schwerdlin, and Thomas Bobis. A similar statement of representation was sent by mail to Allstate that same day, along with "lost time statements" for each claimant.[6] These statements, in the form of a questionnaire, were on Hutul's legal stationery and indicated that they had been sent to "Vito Iosco, d/b/a MAGIC HOUSEWARES COMPANY" to be completed and returned. Each such statement described the "position held" with Magic Housewares by each claimant, his or her salary, and the time lost. The real Anthony and Vito Iosco, father and son, lived at the Melrose Park address but had never run or heard of a business called Magic Housewares, nor had they ever employed any of the claimants or received mail from Hutul regarding the case. The real Ioscos were cousin and uncle of defendant Sacks and were acquainted with defendant Lombardi.

Thereafter, Allstate assigned a claims examiner to the case, who was unable to

---

counts 3, 4, 9, 12, and 16; not guilty on counts 5, 6, 7, 8, 13, and 15. Mitchell was found guilty on counts 3, 7, 8, and 16; not guilty on counts 4, 5, 6, 9, 12, 13, and 15. Lombardi was found guilty on counts 4, 9, and 16; not guilty on counts 3, 5, 6, 7, 8, 12, 13, and 15.

3. Evidence was admitted regarding another accident not included in the indictment, on which the statute of limitations had run.

4. The letters mailed by defendant Hutul to the various insurers provided the bases of the mail fraud counts of the indictment.

5. The Government alleged that the description on the license matched that of defendant Lombardi, although the latter was acquitted of the count of the indictment based on this accident.

6. This letter is the subject of Count 3 of the indictment.

find two of the claimants at the addresses given. Hutul filed suit in August, 1959. In October, Hutul represented to an Allstate claims evaluator the nature of the claimants' alleged jobs with Magic Housewares and showed the latter checks drawn on the Franklin Park Bank allegedly signed by Vito Iosco and payable to the various claimants. Hutul also displayed the Ioscos' "employment records" indicating time and wages lost, and asked for an offer in settlement. In November 1959, Vincent Vaccarello, one of Allstate's attorneys, took depositions of the claimants. Hutul, who was acquainted with Mitchell, was present at each deposition. At trial, Vaccarello identified claimant Laura Young as defendant Mitchell, and claimant Herbert Schwerdlin as defendant Basan.[7] Mitchell's sister, whose address had been given by claimant Laura Young,[8] testified that she had received one letter addressed to Laura Young and had given it to defendant Mitchell. Allstate settled the claims arising from accident No. 1 for a total of $8,360.10, making checks payable to each claimant and Hutul as his or her attorney.

*Accident No. 2.* On April 15, 1959, an application for a driver's license was filed in the name of Victor Gattling, 2450 North Austin Boulevard, Chicago, and a temporary permit was issued. The physical description given on this application matched defendant Lombardi's and the above address was that of Lombardi's brother, Anthony. The same day a driver's license was obtained in the name of Burton Orwitz, who was later identified as defendant Basan.[9] The address given for the license was that of Basan's sister-in-law, Goldie Orwitz, and the car used for the driver's test was Basan's 1956 Cadillac.[10]

The next day, the "accident" occurred between an Aagard Electric Company truck and a car driven by "Victor Gattling" (allegedly defendant Lombardi) which was owned by one John Lombardi. The driver of the truck testified that the other vehicle pulled in front of him and put on its brakes. On July 20, 1959, defendant Hutul sent the insurer of the truck, Commercial Union Group Insurance Company, a letter stating that he represented four claimants as the result of the accident: Burton Orwitz, Victor Gattling, Frank Lassaco, and John Beaverut. Enclosed with the letter were lost time statements similar to those used in accident No. 1, as well as the rest of the accidents. The alleged employer was Losito Sales Co., owned by Ralph Losito, and located at 717 North Ridgeway, Chicago. The real Ralph Losito, who lived at that address, testified that he did not operate any such company, and that the address was a two-family dwelling where defendant Sacks had lived in 1957 or 1958. No such company was registered or licensed in Illinois in 1959 or operated from the address given. Cancelled checks of Losito Sales Company were seen in the front office of White Vending Machine Company by Edward Crawford, an ex-salesman of White Vending.

Hutul, who had been previously acquainted with Basan, submitted a written statement "taken from Burton Orwitz" on August 28, 1959. During that month, Hutul filed suit in Cook County Circuit Court on behalf of the claimants, and mailed three notices to the named defendants' attorneys in connection therewith.[11]

---

7. Schwerdlin was the name of Basan's brother-in-law, deceased defendant Lawrence Schwerdlin.

8. At the discovery deposition Laura Young stated that she was living at her sister's address with the latter and her family.

9. This identification was made at trial by claims investigator George Alexander.

10. A car with the same license number was also used to obtain a driver's license for Leonard Anglin in accident No. 6.

11. These mailings are the subjects of Counts 4, 5, & 6 of the indictment.

*Accident No. 3.* On April 28, 1959, an accident occurred in front of Sacks' White Vending Machine Company [12] between a car driven by one Elizabeth Williams and a double-parked automobile which Mrs. Williams testified contained two men.[13] The next day Hutul sent Mrs. Williams a notice of attorney's lien which stated that he had been retained by four claimants who had all allegedly been in the automobile: Nancy Mitchell; Robert J. Sacks; Robert Forbes; and Robert Fishman. Lost wages statements were mailed by Hutul to Mrs. Williams' insurer, Aetna Casualty Insurance Company,[14] which indicated that Forbes and Fishman were employed by White Vending at a salary of approximately $230 per week, that Mitchell was a telephone sales girl earning $225 per week, and that each had lost from three to five weeks time as a result of the "accident." The address given for claimant Fishman was that of a Joseph Fishman who had nothing to do with the accident, but who was a long-time friend of defendant Basan. Suit was subsequently filed by Hutul on behalf of the four claimants.

Aetna's investigators and attorneys were unable to contact or depose either Forbes or Fishman, but did depose Mitchell, in the presence of an associate of defendant Hutul. At that deposition, Mitchell stated that she earned only $90–$95 per week at White Vending and that she had been in the car hit by Mrs. Williams and injured in the accident when thrown to the floor. Sacks was also deposed by Aetna's attorneys, in Hutul's presence, and stated that Mitchell had been earning $225 per week prior to her layoff due to the accident and was receiving $75 per week after her return. Sacks stated that, on the advice of his attorney, Hutul, he would not produce White Vending Company's employment records, which had been subpoenaed. This lawsuit was subsequently dropped.

*Accident No. 4.* On April 16, 1959, a driver's license was issued in the name of Ralph Windmaur, who was later identified as defendant Lombardi.[15] The description given fit that of Lombardi and the address given was that of one Mrs. Impastato, the wife of Lombardi's cousin, who testified that Lombardi told her to call defendant Sacks if any mail came addressed to Ralph Windmaur and to tell anyone looking for Windmaur that he was a travelling salesman with a "junky car" and was seldom home.[16] During that same month, defendant Sacks contacted an insurange agent, William Babecki, to whom he had previously been introduced by defendant Hutul in the latter's office, for the purpose of referring Babecki to broker an automobile insurance policy for Ralph Windmaur. Babecki never met Windmaur, but brokered the policy with Camden Insurance Company on information furnished by Sacks.

On June 1, 1959, Hutul sent Camden notice of an attorney's lien for an "accident" which allegedly occurred between Windmaur and defendant Basan. Hutul stated that he represented four claimants in regard to the accident: Basan, Vincent Emmerick, Arthur Popolos, and Joseph Anthony. Windmaur (defendant Lombardi) was interviewed by and gave a signed statement regarding the accident to Camden's investigator, Ralph Glidden. On August 18, 1959, Hutul mailed lost-

---

12. The White Vending Machine Company, owned and operated by Defendant Sacks, provided, serviced, and stocked small gum ball machines. The Walgreen Drug chain provided 99% of its business. Defendant Mitchell was Sacks' secretary and Hutul was his, as well as the company's lawyer.

13. Mrs. Williams' car struck this automobile as she attempted to pull around it. At trial, she identified defendant Sacks as the driver of the other car.

14. This and a subsequent mailing were the subject of Counts 7 and 8 of the indictment.

15. This identification was made at trial by Ralph Glidden, an investigator employed by the insurer.

16. When some mail did come addressed to Windmaur, Mrs. Impastato called Sacks' wife and Lombardi immediately came over and picked it up.

time statements to Glidden,[17] which listed a non-existent company, Basan Steel Company, allegedly owned by defendant Basan, as employer of the claimants, and stated time and wages lost due to the accident. In a December 1959 meeting between Glidden, claimants Anthony, Popolos and Basan, and Hutul, Basan stated that he employed the other claimants and produced some checks payable to Anthony and Popolos. Later that month, in Hutul's office and in the presence of an associate of Hutul, Glidden interviewed claimant Emmerich, who gave the address of a defunct business as that of a firm for which he worked. No payments were made to any claimant in this case.

*Accident No. 5.* On May 25, 1959, a driver's license was issued in the name of Lawrence Miller. The address given— which was also used in the accident to follow—was that of one Peter Miller, a good friend of the deceased defendant Lawrence Schwerdlin, who had nothing to do with the accident. On June 3, a car owned by Alan Wolfe and driven by one John Lenard[18] allegedly struck a car owned by defendant (Laura) Mitchell and driven by Lawrence Miller. On June 18, Hutul, on behalf of three claimants— Lawrence Miller, Howard Bell, and Maynard Adams—sent a notice of attorney's lien to Wolfe, who passed it on to his insurer, Camden Fire Insurance Company, which in turn passed it on to the same Ralph Glidden who investigated accident No. 4.

Glidden interviewed Wolfe and later interviewed Lenard at the Grove Street address given by Lenard to Glidden. This interview took place in Glidden's car. Glidden was unable to locate any of the claimants at the addresses given by them in the police report of the accident. Upon inquiry, Hutul offered the explanation that the claimants were hiding due to marital difficulties. Defendant Basan, in a later interview in Hutul's office, stated that although he had not seen claimant Miller for about a year, the latter was operating an awning company on Lawrence Avenue. On November 2, 1959, Hutul mailed Glidden lost time statements for each claimant,[19] which indicated that a fictitious Comfort Awning Company was the employer. The address given for this company was that of an answering service rented for one month by deceased defendant Schwerdlin, defendant Basan's brother-in-law, who had been there only once. The address given for claimant Bell was that of Basan's cousin, Elaine Bell, who testified that Basan had obtained her permission to use her address as a mailing address. The address given for claimant Maynard Adams was that of a friend of Alan Wolfe, the alleged owner of the car at fault in this accident, who had received mail addressed to Maynard Adams but had taken it to the post office as unclaimed.

*Accident No. 6.* On July 6, 1959, an application for a driver's license was filed in the name of Leonard Anglin. The address given was that of Defendant Sacks (which address was known by Hutul). The physical description matched that of defendant Basan. The same car that was used to obtain this license was also used to obtain the license of Burton Orwitz in Accident No. 2. On July 10, a driver's license was applied for in the name of Jack Reiter. The address given for this license was that of one Dorothy Zackert, who testified that deceased defendant Schwerdlin—Basan's brother-in-law— received mail addressed to Jack Reiter at that address. The same car was used to obtain Reiter's license as was used to obtain the license of Lawrence Miller

---

17. This mailing is the subject of Count 9 of the indictment.

18. Lenard was allegedly employed by White Vending Company and owned a car which was used in accident No. 6, which had an Illinois License number one digit lower than that of defendant Mitchell's car which was involved in this accident. Also, Lenard gave as his address 900 N. Grove Street, an address of defendant Sacks.

19. This mailing is the subject of Count 12 of the indictment.

in accident No. 5. The physical description on each matched that of Schwerdlin.

On July 11, an alleged accident occurred between a car owned by John Lenard, the owner of one of the cars used in accident No. 5, and driven by Jack Reiter and a car driven by Leonard Anglin. The insurance policy on Reiter's car was issued by Ohio Casualty Company and paid by someone from White Vending Company. The insurance company's files indicated that John Lenard worked at White Vending. On July 16, Hutul mailed a notice of attorney's lien which stated that he represented three claimants involved in the accident: Phillip Krasnek, Allen Borg, and Leonard Anglin.[20] The insurance company's investigator interviewed John Lenard at the White Vending Company in the presence of defendant Sacks, who participated in the conversation, and a female secretary. On October 22, 1959, Hutul mailed to the insurer lost time statements for his alleged clients, indicating that they were employed by a Seaway Trading Company[21] owned by Leonard Anglin. The real Leonard Anglin, defendant Sacks' brother-in-law, testified that he knew nothing of such a company and that he did not live at the address (that of defendant Sacks) given on the July 6 driver's license application and on the police report of the accident. He also testified that the signatures on the lost-time statements resembled but were not his. A former employee of Sacks, Edward Crawford, testified that he saw stationery of Seaway Sales Company in the White Vending Company office. This case was settled by the insurer for $480.[22]

*Prior Related Accident.* Evidence was introduced of a prior accident on which the limitation period had run. This accident allegedly occurred on March 23, 1959, as a result of which Hutul filed claims for five alleged employees of White Vending Company, resulting in a $17,400 settlement.[23] A method similar to that employed in the other six accidents was used involving lost wages statements signed by defendant Sacks. This brought to ten the number of White Vending Company employees (salesmen) involved in the various accidents which took place in 1959. However, in 1961, Hutul helped Sacks answer an interrogatory which stated that White Vending had only four employees in 1959, and only one was in sales.

## SUFFICIENCY OF THE EVIDENCE ON THE SUBSTANTIVE COUNTS

■■ Defendants all argue that the evidence was insufficient to connect them with the crimes for which they were convicted. We find that while the evidence adduced at trial did not link every defendant with the acts charged in every substantive count, as evidenced by the discriminating verdicts of the jury, there was sufficient evidence, when viewed in a light most favorable to the Government, with all reasonable inferences drawn therefrom,[24] to support the convictions on the substantive counts. From our review of the accidents, it can be noted that the scheme involved the use of prior and present addresses of some of the conspirators and the names of innocent persons who were remotely connected with the conspirators. We shall demonstrate the sufficiency of the

---

20. This mailing is the subject of Count 13 of the indictment.

21. The address given for non-existent Seaway was that of an answering service.

22. For the reader's benefit, a breakdown of the accidents and the counts based thereon is as follows:

| Accident: No. | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Count: | 3 | 4,5,6 | 7,8 | 9 | 12 | 13,15 |

23. One of these claimants was a Michael Sansone, who had died 20 years before.

24. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457 (1942).

evidence by briefly reviewing the proven acts of each defendant.

*Sacks.* Looking first to Sacks' personal connection with the other co-conspirators, we see the following: Lombardi is Sacks' brother-in-law; Mitchell was his secretary; Hutul was his attorney and attorney for Sacks' White Vending Company; Basan is a friend of Sacks and was once named as an employee of White Vending; deceased defendant Schwerdlin was a friend of Sacks and a past employee of White Vending.

Since the scheme revolved in large part around White Vending Company, Sacks' ownership is significant in light of the following additional facts: (1) White Vending was used as "employer" of the claimants in accident No. 3 (in which Sacks was identified as the driver of one of the cars and was himself a claimant) and the prior related accident; (2) the fictitious Ralph Windmaur, whose insurance was arranged by Sacks, was an alleged employee of White in accident No. 4. Also regarding this accident, Sacks, or his wife, gave the message to Lombardi to pick up the mail addressed to Windmaur at Mrs. Impastato's; (3) the fictitious John Lenard, the driver of the assured vehicle in accident No. 6, was also an alleged employee of White Vending and was interviewed there in Sacks' presence; (4) blank checks of the fictitious Losito Sales Company (used in accident No. 2) and stationery of Seaway Sales Company (used in accident No. 6) were seen on the premises of White Vending; (5) the premium for the insurance policy which covered the fictitious Jack Reiter in accident No. 6 was paid by someone at White Vending.

Sacks also played a major part in providing the fictitious names and addresses used in the conspiracy: (1) Vito and Anthony Iosco, alleged operators of Magic Houseware Company in accident No. 1, were Sacks' cousin and uncle; (2) Ralph Losito, alleged owner of Losito Sales Company in accident No. 2, knew Sacks and the latter lived at the address given for Losito; (3) Leonard Anglin, a fictitious claimant in accident No. 6, was the name of Sacks' brother-in-law and the address given was that of Sacks' residence; (4) the address used for John Lenard in accidents No. 5 and 6 was one of Sacks' addresses.

*Hutul.* This defendant served as attorney for all claimants in each accident. He knew Lombardi and Basan, yet represented them as claimants in accident No. 2, where they assumed the names of Victor Gattling and Burton Orwitz respectively. Similarly, Hutul knew Mitchell, yet represented her as Laura Young and Basan as Herbert Schwerdlin in accident No. 1. Hutul's involvement in the accidents, his representations as to the identity and employment of the claimants, and his presence during various interviews and depositions are adequately recited in the summary of the accidents.

Moreover, Hutul was intimately connected with Sacks and White Vending Company and admitted knowing that Leonard Anglin, in accident No. 6, was the name of Sacks' brother-in-law and that the address given for Anglin was Sacks'. Hutul also knew that the address given for John Lenard in accidents No. 5 and No. 6 was Sacks'. Hutul represented numerous claimants as employees of White Vending in 1959 and sued two other alleged White employees that year; yet he helped Sacks answer an interrogatory in 1961 which stated that White employed only four people in 1959.[25]

Hutul's claim of innocent reliance on the representation made by the "employers" on the lost wages statements allegedly mailed by him to them was disproven at trial. Two of the alleged employers, Ralph Losito (accident No.

---

25. Defendant Sacks claims that this statement is consistent with his contention that the various "employees" shown on the lost wages statements were actually independent contractors and sales representatives.

2), and the Ioscos (accident No. 1), testified that they never received any correspondence from Hutul regarding the accidents. This is in addition to the fact that Hutul personally knew many of the alias claimants. The obvious conclusion is that Hutul never sent the statements to the alleged "employers" but either filled them out himself or in cooperation with the other parties to the conspiracy.

*Basan.* This defendant was identified as Leonard Anglin in accident No. 6 and as Burton Orwitz in Accident No. 2. In the latter case, the address given for Orwitz was that of Basan's sister-in-law, Goldie Orwitz. Basan was also identified as Herbert Schwerdlin in Accident No. 1 (Schwerdlin was the name of Basan's brother-in-law, deceased defendant Lawrence Schwerdlin). Basan was the "owner" of the fictitious Basan Steel Company, the alleged employer of the claimants in accident No. 4. The driver's tests in accidents No. 2 and No. 6 were taken in Basan's car. Finally, the address given for the fictitious claimant Howard Bell in accident No. 5 was that of Basan's cousin, who had given Basan permission to use that address as a mailing address.

*Lombardi.* This defendant was identified by insurance investigator Glidden as Ralph Windmaur in accident No. 4. The address used to register the car and obtain the driver's license in Windmaur's name was the address of Lombardi's cousin, whose wife, Mrs. Impastato, had agreed to let Lombardi receive mail there addressed to Windmaur. Mrs. Impastato was also used to get the mail to Lombardi by calling Sacks or the latter's wife and was given a story by Lombardi to tell anyone looking for Windmaur. The description on the driver's license fit Lombardi.

In accident No. 2, there was sufficient evidence to show that the fictitious Victor Gattling was in fact Lombardi. The address given for Gattling, both on the driver's license and on the accident report, was that of Lombardi's brother, Anthony. The car used to take the driver's test in the name of Gattling bore the same license number as the car registered to the fictitious Ralph Windmaur in accident No. 4. The physical description on the license matched Lombardi. Lombardi was also acquainted with the Ioscos in accident No. 1.

*Mitchell.* This defendant was identified by attorney Vaccarello as claimant Laura Young in accident No. 1, who stated at the discovery deposition that she was living with her sister. This address was that of Mitchell's sister, Mrs. Pantano. Laura was defendant Mitchell's real first name. Mitchell was also a claimant in her own name in accident No. 3. Her car was also used in accident No. 5 where it was driven by the fictitious Lawrence Miller.

On the basis of the facts as disclosed by the record, which we have reviewed at great length, we conclude that, with one exception, the evidence was sufficient to support the convictions on the substantive counts of the indictment of which the defendants were found guilty by the jury. The exception concerns Sacks' conviction of Count 3. Sacks' only connection with accident No. 1, which was the subject of that count, was that the names of the alleged employers of the claimants were those of his cousin and uncle, and that Mitchell (alias Laura Young) was Sacks' secretary. Although we are reluctant to disturb a jury's findings of fact—especially a jury which displayed as conscientious an effort to arrive at a fair verdict as that in the instant case—we feel that the evidence linking Sacks to accident No. 1 was insufficient to support his conviction therefore.[26] In all other respects, however, we find that the record supports the verdicts.

---

26. This finding does not require a reversal of Sacks' conviction, since the identical sentences on each count are to be served concurrently. See United States v. Nitti, 374 F.2d 750, 752 (7th Cir. 1967) ; United States v. Weaver, 360 F.2d 903, 905 (7th Cir. 1966) ; United States v. Mayo, 340 F.2d 943, 944 (2d Cir. 1965).

The defendants' arguments as to sufficiency of the evidence on the substantive counts attack the credibility of witnesses, disregard the fact that guilt can be proven by circumstantial evidence, Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150 (1954), and generally ignore the function of the jury in criminal trials. Defendants do not, in their briefs, look at the evidence as a whole, or in the light most favorable to the Government, but rather isolate various bits of testimony and argue that each was insufficient to support the verdicts. However, the evidence presented concerning the various accidents overlaps and cannot be viewed in a vacuum.

In short, with the exception of Sacks' conviction of count 3, we find no deficiency in the evidence which would make it legally insufficient to support the verdicts.

## CONSPIRACY

All defendants, except Hutul, allege that the evidence proved six or seven separate conspiracies, rather than the single conspiracy charged in the indictment, and therefore reversal is required. Reliance is placed on Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), Barnard v. United States, 342 F.2d 309 (9th Cir. 1965) and United States v. Varelli, 407 F.2d 735 (7th Cir. 1969). We are of the opinion that the factual distinctions existing between those cases and the instant case renders their holdings inapplicable to the case at bar.

In Kotteakos, the Government admitted that the evidence proved eight or more separate conspiracies to violate the National Housing Act (12 U.S.C. §§ 1702, 1703, 1715, 1731), rather than the one conspiracy charged. Although one defendant, Brown, was "the common and key figure in all the transactions proven," there were "'at least eight, and perhaps more, separate and independent groups [including 32 persons], none of

which had any connection with any other, though all dealt independently with Brown as their agent.'" 328 U.S. at 753, 754, 66 S.Ct. at 1243. The Court, in holding that the joining as one conspiracy the number of different conspiracies actually proven was not harmless error under § 269 of the Judicial Code (28 U.S.C. § 391), stated that "[t]he dangers of transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise are so great that no one can really say prejudice to substantial right has not taken place." 328 U.S. at 774, 66 S.Ct. at 1252.

In Barnard, supra, the indictment charged 28 defendants with conspiring to defraud various insurance companies by staging five automobile accidents [27] and claiming damages for personal injuries in connection therewith. The Court of Appeals found that 22 defendants were connected with only one collision, three were connected with two collisions, and one was connected with three collisions. Only the defendant Barnard was involved in, and in fact planned, all five accidents. The Court reversed the convictions, stating that each accident was planned separately and that no evidence was presented which showed that the planning of each accident contemplated more than that particular one.

In United States v. Varelli, supra, this Court reversed convictions for conspiring to commit various truck hijacking offenses. The Court held that "while the hijackings were sufficiently related to allow all the defendants to be tried together, there was not sufficient evidence from which it could be concluded that there was one overall conspiracy." As in Kotteakos, the instructions permitted the jury to "transfer guilt from one to another and to find defendants guilty of an overall conspiracy although they were only related to [one] hijacking" 407 F.2d at 747. In discussing the standards to be applied

---

**27.** Evidence of a sixth accident was also introduced.

in determining whether one or more conspiracies are proven at a trial, the Court (at 407 F.2d 741–742) engaged in the following, thorough discussion of the law, to which further comment would be superfluous:

"Agreement is the primary element of a conspiracy. The formalities of an agreement are not necessary and are ususally lacking since the mark of a successful conspiracy is secrecy. 'The agreement may be shown "if there be a concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose." Fowler v. United States (CCA 9), 273 F. 15, 19.' Marino v. United States, 91 F.2d 691–694 (9th Cir. 1937). While the parties to the agreement must know of each other's existence, they need not know each other's identity nor need there be direct contact. The agreement may continue for a long period of time and include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate conspiracies. See Developments in the Law—Criminal Conspiracy, 72 Harv. L.Rev. 920, 922–35 (1959).

"The distinction must be made between separate conspiracies, where certain parties are common to all and one overall continuing conspiracy with various parties joining and terminating their relationship at different times. Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy.

"In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy."

In United States v. Palermo, 410 F.2d 468 (7th Cir. 1969), this Court, at page 470, in holding that only one conspiracy was proven, cited United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168 (1910), for the proposition that where the agreement

" * * * contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one."

In the instant case, the evidence supports the jury's verdict that the defendants were joined in a single conspiracy which contemplated a series of bogus automobile accidents for the purpose of defrauding the various insurers. The defendant Hutul was the nexus of the scheme. He testified that as a practicing attorney, he knew that the files of the Mutual Index Bureau, designed by the insurance industry to provide a record of claimants, were kept by name and thus knew that resort to the Bureau could be rendered ineffective by the use of different aliases in a series of accidents. Accordingly, a small number of conspirators, none of whom used the same name more than once, was able to accomplish the result achieved in the *Barnard* scheme with the use of 28 persons.

But this required careful planning and the cooperation of each of the persons involved in the venture. Thus, the scheme embraced the obtaining of automobile titles, license plates, drivers' licenses and insurance policies under aliases. The names and addresses which were to be given to obtain these items were selected and in some cases answer-

ing services and mail drops were established under the fictitious names. Evidence was presented which demonstrated the continuity of the overall plan which links the accidents together as part of an overall conspiracy and refutes the contention of separateness. Thus, White Vending Company was connected with accidents Nos. 2, 3, 4, 5, and 6. Hutul employed identical procedures for filing the fraudulent claims in each accident. The names and addresses used were those of the various defendant's relatives or friends. Some of the automobiles were used in more than one accident for various purposes. Evidence was presented which showed that the five defendants were well-acquainted with each other in both business and, in some cases, their personal relationships.[28]

Unlike *Barnard*, where the accidents took place over a one and one-half year period, the accidents in the instant case took place over a three and one-half month period. Also distinguishing the instant case from *Barnard* is the small number of conspirators involved and the proven connection of three of them with all the accidents and the other two with two or three of the accidents. That this numerical difference is significant was stated by the Supreme Court in *Kotteakos* in its distinguishing *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), which held that improper joinder of two conspiracies was harmless error: "The sheer difference in numbers both of defendants [four in *Berger* and 32 in *Kotteakos*] and of conspiracies proven [two in *Berger* and eight or more in *Kotteakos*], distinguishes the situation." 328 U.S. at 766, 66 S.Ct. at 1249.

In both *Kotteakos* and *Barnard*, the Government proved only a pattern "of separate spokes meeting at a common center," but was unable to show a " 'rim of the wheel to enclose the spokes,' "[29] and thus failed to prove the charge of one conspiracy. In the instant case Hutul occupies the same central position as did Brown in *Kotteakos* and Barnard in *Barnard*. However, here the evidence disclosed the rim of the wheel by demonstrating the interrelationships between the persons and the events. We are confronted with a record which contains sufficient evidence to support the finding that the defendants were members of a sodality of fraud and knowingly participated together to achieve the common illegal goal. The desired result was not one, but many accidents upon which the claims would be based. Each defendant did his part in promoting the venture and providing a necessary link in the scheme. See *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir. 1940).

The propriety of drawing the conclusion of conspiracy from all, rather than merely particular fragments of the evidence is no longer subject to serious question. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Kotteakos v. United States*, 328 U.S. 750, 762, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Zuideveld*, 316 F.2d 873, 877–878 (7th Cir. 1963), cert. den. 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612. Such evidence used to show a conspiracy may be, and usually is, circumstantial rather than direct. *United States v. Lutwak*, 195 F.2d 748, 753 (7th Cir. 1952), aff'd. 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593. Moreover, there is no requirement that every defendant must participate in every transaction in order to have a single conspiracy, as long as they participate in a common plan or series of transactions. *United States v. Varelli*, 407 F.2d 735, 741 (7th Cir. 1969); *United States v. Scott*, 413 F.2d 932 (7th Cir., April 28, 1969). We hold

---

28. Among the evidence concerning such relationships was testimony that Mitchell and Hutul were visitors to Sacks' home, the fact that Hutul had represented Basan in the past, and that all defendants' were frequently seen at White Vending Company.

29. 328 U.S. at 755, 66 S.Ct. at 1243.

that the evidence supported the finding of a single conspiracy and accordingly reject defendant's arguments on this point.

## JOINDER AND SEVERANCE

■ All defendants, except Hutul, allege improper joinder and abuse of discretion by the trial court in denying their motions for severance. They argue that even if one conspiracy was shown and joinder was thereby proper under Rule 8, Fed.Rules Crim.Proc., the complexity of the evidence and the antagonistic position taken by defendant Hutul required the district court to grant defendants' motions for severance. The arguments mainly rest on the length of the trial—it lasted over one month and involved the testimony of more than 50 witnesses and numerous exhibits—which defendants contend was so confusing that the jury could not segregate the evidence against each defendant. Thus, each defendant (except Hutul) claims that since much of the evidence presented at trial was not concerned with him but with the other defendants, the verdicts were products of "guilt by association" rather than an evaluation of the evidence against the particular defendant.

The record confutes the argument that the jury was overwhelmed by the complexity of the evidence. As previously discussed, the verdicts reveal an unusual degree of discrimination on the part of the jury which, it is apparent, was neither confused by the evidence nor prone to take its duty lightly. The indications asserted by defendants as evidencing the jury's confusion are unfounded. Thus, the finding that defendants Sacks and Hutul were guilty as to Count 13, which had been dismissed before trial, resulted from the clerical error of including that count on the verdict form submitted to the jury. Also, the fact that Sacks was found guilty of

Count 4 and not guilty of Counts 5 & 6, when they all concerned the same accident, does not demonstrate confusion on the part of the jury. Rather, it shows that the jury carefully examined each count as to each defendant and rendered its verdict accordingly. We note that no defendant was convicted of Count 5, and all but Hutul were acquitted of Count 6. It is not the function of an appellate court to "substitute our judgment for that of the jury" since "under our system of justice, juries alone have been entrusted with [the] responsibility" of determining guilt or innocence. Weiler v. United States, 323 U.S. 606, 611, 65 S.Ct. 548, 89 L.Ed. 495 (1945). Accordingly, we shall not speculate as to what defects the jury found in the various counts of the indictment when related to the evidence.

■ The other alleged indications of confusion and allegations of "guilt by association" are conclusions which are unsupported by the record.[30] While the nature of the scheme charged in the indictment necessitated a lengthy trial, we find nothing in the record which demonstrates that "the possibilities of danger to a fair trial [became] realities of prejudice in the jury." United States v. Kahn, 381 F.2d 824, 839 (7th Cir. 1967).

■ Moreover, the antagonistic defense of Hutul did not require the granting of severances under Rule 14, Fed. Rules Crim.Proc.

" ' * * * The mere fact that there is hostility between defendants or that one may try to save himself at the expense of another is in itself alone not sufficient grounds to require separate trials. It is only when the situation is such that the exercise of common sense and sound judicial judgment should lead one to conclude that one defendant cannot have a fair trial, as that term is understood in law, that a severance should be granted.' "

30. Sacks also contends that the joint trial precluded him from calling Hutul and Mitchell as witnesses for the defense. However, separate trials would not have enabled Sacks to force these other criminal defendants to testify, since the Fifth Amendment privilege against self-incrimination would still apply to them.

Dauer v. United States, 189 F.2d 343, 344 (10th Cir. 1951), cert. den. 342 U.S. 898, 72 S.Ct. 232, 96 L.Ed. 672.

See also United States v. Echeles, 222 F.2d 144, 151 (7th Cir. 1955); Baker v. United States, 329 F.2d 786, 787 (10th Cir. 1964).

In addition, as the Government points out in its brief, defendant Hutul's defense was rejected by the jury, as evidenced by his conviction on all but one count. On the record before us, therefore, we find that joinder was proper under Rule 8 and that the district court did not abuse its discretion under Rule 14 in refusing to grant a severance on the basis of alleged prejudice. See United States v. Scott, *supra*.[31] The granting of severance is within the sound discretion of the trial court, and defendants have failed to make the "strong showing of prejudice" necessary to support their contentions. United States v. Kahn, 381 F.2d 824, 829 (7th Cir. 1967), cert. den. 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661.

### OTHER ALLEGED ERRORS

█ 1. In connection with their contentions of prejudicial joinder, defendants Sacks and Mitchell argue that reversal is required by the comments to the jury made by counsel for defendant Hutul that the latter was the only defendant who testified in his own defense. In his closing argument to the jury, Hutul's attorney made the following remarks:

"I must apologize for my client who on the stand over-stated some things. * * *

"* * * I speak only for Mr. Hutul. He was the only one who testified in this case. It is an old case. * * *

\*    \*    \*    \*    \*    \*

"Again, as I say, our defense is, Mr. Hutul took the stand and he testified that whatever he did, he did in good faith and let me tell you * * *

as far as Mr. Hutul is concerned, this case is based on circumstantial evidence."

The defendants claim that the holding of DeLuna v. United States, 308 F.2d 140, 154–155 (5th Cir. 1962), as reviewed by this Court in United States v. Kahn, 391 F.2d 824 (7th Cir. 1967), demonstrates prejudice and requires reversal. In *DeLuna*, the co-defendant Gomez's attorney, after noting to the jury that his client had testified, went further and repeatedly and accusingly stated that De-Luna had not taken the stand and subjected himself to cross-examination. The jury acquitted Gomez and convicted DeLuna. The Fifth Circuit reversed the conviction, holding that the comments were so prejudicial to DeLuna and so destructive of his Fifth Amendment right not to testify that no instruction could have cured the error.

"If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a co-defendant's silence, the trial judge's duty is to order that the defendants be tried separately." 308 F.2d at 141.

The nature of the prejudicial comments in *DeLuna* differs significantly from the statements in the instant case. Hutul's attorney's comments were part of his defense that he acted in good faith and that there was no direct, but only circumstantial evidence of his participation in the fraudulent scheme. In presenting such defense, Hutul took the stand to explain his actions. Viewed in the context of the argument to the jury, then, the comments which defendants seek to isolate are seen to not be directed negatively to the other defendants' failure to testify, but rather positively to Hutul's good faith defense, a defense not offered by any other defendant.

Thus, this case resembles Parker v. United States, 404 F.2d 1193 (9th Cir. 1968), more than *DeLuna*. In *Parker*, the Court held that reversal was not re-

---

31. We also note that no defendant moved for severance until shortly before trial.

See United States v. Echeles, 222 F.2d 144, 151 (7th Cir. 1955).

quired by the argument of counsel for one of the appellant's co-defendants, that the latter "took the witness stand * * and he told everything" and that another co-defendant " '[was] in a very difficult situation of getting on the stand. He hid nothing from you.' " Rather than being comments on the appellant's failure to testify, they "were [when taken in context] merely arguments in support of [the co-defendants'] veracity." 404 F.2d at 1197. Likewise, the comments in the instant case were merely incidental to the points properly made in the closing argument of counsel for defendant Hutul and as we stated in United States v. Hephner, 410 F.2d 930, 936 (7th Cir. 1969),

> "was far from the 'extensive argument asking the jury to overlook inferences favorable to petitioner because he invoked his constitutional right not to testify,' which was condemned in Anderson v. Nelson, 390 U.S. 523, 525, [88 S.Ct. 1133, 1135, 20 L.Ed.2d 81] (1968). Thus, even if the comment was error, it was 'harmless beyond a reasonable doubt.' Chapman v. California, *supra*, 386 U.S. at 24 [87 S.Ct. 824, 17 L.Ed.2d 705]."

2. Defendant Lombardi contends that the district court erred by failing to poll the jurors individually regarding an allegedly prejudicial newspaper article—which revealed a prior criminal conviction—that appeared on the second day of the trial. Lombardi claims that the collective inquiry of the jury—to which no juror responded affirmatively—was insufficient under this Court's holding in United States v. Accardo, 298 F.2d 133, 136 (7th Cir. 1962). A similar contention was recently rejected by this Court in Margoles v. United States, 407 F.2d 727, 735 (7th Cir. 1969):

> "[T]he procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been

exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further."

Accordingly, we hold that the district court, in its collective inquiry, adequately protected Lombardi's right to a fair trial.

3. Defendants Mitchell and Hutul contend that the district court improperly precluded certain cross-examination of witnesses Vaccarello (an attorney for the insurer in accident No. 1) and Alexander (a claims adjustor for the insurer in accident No. 2) regarding their identification of Mitchell as Laura Young in accident No. 1 and Basan as claimants Orwitz (accident No. 2) and Schwerdlin (accident No. 1). We note that the decisions of the Supreme Court in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), regarding the right to counsel at certain pretrial identification proceedings, applied prospectively and thus do not govern the trial of this case. Stovall v. Deno, 388 U.S. 293, 296, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

However, the principles of Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), do govern this case, although we are of the opinion that the facts do not require reversal. Defendants contend that the pre-trial photographic identification of them by the witnesses was so inherently suggestive as to invalidate the in-court identification and that they were precluded from demonstrating this to the jury during cross-examination. In *Simmons*, the Supreme Court discussed the dangers inherent in photographic identi-

fication, and stated (at p. 384, 88 S.Ct. at p. 971):

"Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

See also United States v. Robinson, 406 F.2d 64, 67 (7th Cir. 1969).

Thus, we must look at the facts as disclosed by the record to determine whether the court below precluded that cross-examination which the Supreme Court held to be the safeguard against the dangers of photographic identification. The cross-examination in question covers hundreds of pages of the transcript and, while there were numerous objections made by the Government which were sustained by the Court, a review of the record discloses no prejudicial error. Counsel for the defense elicited testimony from the witness Vaccarello that he was shown photographs which contained only two pictures of females, one of which was identified as that of defendant Mitchell. The circumstances surrounding the pretrial identification of the defendants, and the potential for error, was amply exposed to the jury, which had the duty to weigh this factor in reaching its verdict. The court sustained objections only to improper attempts to impeach the witnesses and other improper questioning.

While the ruling in *Simmons* encourages the use of cross-examination as a safeguard against the dangers of photographic identification, it does not open the door to limitless examination of identification witnesses in disregard of the traditional rules of evidence. We find that the limitations placed by the district court on the cross-examination in the instant case did not deny defendants due process of law or preclude them from placing before the jury the issue of whether the in-court identifications were the products of overly suggestive pre-trial photographic identification procedures.

4. Defendant Hutul also contends that the district court erred in refusing to admit into evidence certain "3500 statements" [32] of witnesses Vaccarello and Mazzone (an insurance investigator) which allegedly disclosed that defendant Basan was not identified by Vaccarello as claimant Orwitz (in accident No. 2) when the latter was initially shown the photographs by Mazzone. Hutul claims such exclusion was an improper denial of his right to impeach Vaccarello's testimony. While the failure to require production of a written statement which properly comes under § 3500 is reversible error, Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963), such statement must be adopted by the Government witness before production will be required. See Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959).

As evidenced by the testimony in the instant case, Vaccarello neither signed nor adopted the contents

32. Allegedly taken pursuant to 18 U.S.C. § 3500.

allegedly contained in the document in question, and thus the court did not err in refusing to admit it. A review of the record discloses that counsel for the defense was allowed to and did elicit testimony regarding Vaccarello's prior identification of Basan, and used the statement, which Vaccarello stated he had never seen before, in an unsuccessful attempt to refresh the witness' recollection. The witness Mazzone also testified, on cross-examination, that Vaccarello had identified Basan. Mazzone's report did not fall under § 3500 since Mazzone was not a Government agent, but an agent of the American Insurance Association, and was not called by the United States, but as the court's witness. 18 U.S.C. § 3500(e). We find no error here.

◼ 5. Defendant Hutul also alleges that the district court erroneously precluded him from testifying that he acted in good faith. Since good faith is a complete defense to mail fraud under 18 U.S.C. § 1341, Beck v. United States, 305 F.2d 595 (10th Cir. 1962), Hutul contends that the alleged refusal by the court to allow certain testimony by him was reversible error. We agree that Hutul had the right to testify as to what his beliefs, motives, and intentions were regarding the various transactions, but upon review of the record, find that he was not precluded from so testifying. Hutul gave extensive testimony concerning his reliance upon representations allegedly made to him by the other defendants, his alleged lack of knowledge of the true facts, and the basis of his beliefs regarding the fictitious claimants, employers, and employment records used in the scheme.

The questions to which objections of the Government and Hutul's co-defendants were sustained were either leading or called for conclusions of facts which were incriminating to the other defendants and were for the jury to make. Other questions called for breaches of the attorney-client privilege. We find that the sustaining of the objections in no way precluded Hutul from presenting his defense of good faith. The jury was provided with an ample record by both the prosecution and the defense, and its verdict against Hutul cannot be attacked as the product of an improperly incomplete defense.

◼ 6. Defendant Sacks contends that the admission, over the general objections of all defendants, of evidence of the prior accident, which was not included in the indictment because the statute of limitations had run as to it, was improper and that the court's failure to give a limiting instruction, although none was requested by the defendant, was reversible error. The evidence in question was properly admitted to show motive, intent, and similarity of scheme. Lisenba v. California, 314 U.S. 219, 227, 62 S.Ct. 280, 86 L.Ed. 166 (1941); United States v. Cobb, 397 F.2d 416 (7th Cir. 1968); United States v. Hoffman, 415 F.2d 14 (7th Cir., July 18, 1969); United States v. Marine, 413 F.2d 214 (7th Cir., July 7, 1969). This kind of evidence is particularly appropriate where, as with mail fraud, criminal intent is an essential element of the crime charged. Windsor v. United States, 384 F.2d 535 (9th Cir. 1967); Fournier v. United States, 58 F.2d 3 (7th Cir. 1932). Sacks argues that even if the evidence was admissible, he was entitled to an appropriate instruction limiting such evidence to the issue of intent, even without a request for such an instruction, citing Screws v. United States, 325 U.S. 91, 106–107, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). In *Screws*, the Supreme Court noted that a necessary instruction had not been given to the jury, and stated (at p. 107, 65 S.Ct. at p. 1038):

"It is true that no exception was taken to the trial court's charge. Normally we would under those circumstances not take note of the error. See Johnson v. United States, 318 U.S. 189, 200 [63 S.Ct. 549, 555, 87 L.Ed. 704]. But there are exceptions to that rule. United States v. Atkinson, 297 U.S. 157, 160 [56 S.Ct. 391, 392, 80 L.Ed. 555;] Clyatt v. United States,

197 U.S. 207, 221–222 [25 S.Ct. 429, 433, 49 L.Ed. 726]. And where the error is so fundamental as not to submit to the jury the essential ingredients of the only offense on which the conviction could rest, we think it is necessary to take note of it on our own motion."

On the record before us, we do not feel that the failure to give a limiting instruction on the evidence concerning the prior accident, *sua sponte,* was "so fundamental" as to deprive Sacks of a fair trial. See United States v. Schwartz, 398 F.2d 464, 470 (7th Cir. 1968), cert. den. sub nom. Pyne v. U. S., 393 U.S. 1062, 89 S.Ct. 714, 21 L.Ed.2d 705; United States v. Smith, 283 F.2d 760 (2d Cir. 1960), cert. den. 365 U.S. 851, 81 S. Ct. 815, 5 L.Ed.2d 815. The prior accident was one of a series of such fraudulent accidents which were part of an overall scheme to defraud the various insurers. As such, evidence of it was properly admissible to prove as essential element of the crime charged, and the defense would have been entitled, upon request, to an instruction so limiting the use of the evidence.

However, we can not hold the district court to such a strict standard as to require the giving of such an instruction *sua sponte.* The only relevant objection to the instructions given on this point concerned the contention that the term "other offenses" was improperly limited to defendants presenting a defense of good faith, which Sacks did not present. No objection was made to the absence of an instruction limiting the evidence of the prior accident to the issue of intent, and none was offered. Perhaps such silence can be attributed to trial tactics of counsel for defense as well as to oversight, but it cannot now be used to support a claim of reversible error.

■ 7. Defendant Lombardi contends that the district court erred in

denying his motion for a bill of particulars which sought to require the Government to state in which of the offenses charged in the indictment he participated. Defendant alleges that the denial resulted in his not being able to properly prepare his defense.

These bare allegations fail to establish the necessary showing that he was taken by surprise at any time or that he was otherwise prejudiced. Without such a showing, we must leave the question of whether or not to grant a bill of particulars to the sound discretion of the trial court.[33] See Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545 (1927); United States v. Kushner, 135 F.2d 668, 673 (2d Cir. 1943), cert. den. 320 U.S. 212, 63 S.Ct. 1449, 87 L.Ed. 1850; Peck v. United States, 65 F.2d 59, 61 (7th Cir. 1933), cert. den. 290 U.S. 701, 54 S.Ct. 229, 78 L.Ed. 603. We find no error in the denial of Lombardi's motion for a bill of particulars.

■ 8. Defendant Basan contends that the Government failed to prove an essential element of its case—the corporate identity of the insurers. When the criminal offense charged involves money or property, defendant argues, the ownership of such money or property must be established and where ownership is that of a corporation, its corporate identity must be proven in order to establish the substantive crime.

The Government cites Belvin v. United States, 273 F.2d 583 (5th Cir. 1960), cert. den. 372 U.S. 922, 83 S.Ct. 737, 9 L. Ed.2d 726, for the proposition that the character of an association or legal entity need not be pleaded in the indictment, and King v. United States, 25 F.2d 242 (6th Cir. 1928), for the holding that proof of corporate identity of alleged victims is not required in a mail fraud case where "[t]he gravamen of the offense [is] the misuse of the mails," not the defrauding of insurers, 25 F.2d at 245.[34] We are of

---

33. We note that there is no complaint made by any defendant that the indictment was insufficient in its particularity.

34. See also United States v. Browne, 225 F.2d 751 (7th Cir. 1955) ; United States v. Minnec, 104 F.2d 575 (7th Cir. 1939),

the opinion that while the proof of a scheme to defraud is required in a prosecution for mail fraud, the requirement in all cases of proof of corporate identity of the alleged victims would be a meaningless technicality.

In United States v. Scoblick, 225 F.2d 779, 782 (3rd Cir. 1955), the only federal case cited by Defendant Basan, the court mentioned that corporate existence had been sufficiently proven. From this, defendant Basan submits "that the Court would not have made such a statement unless it was of the opinion that proof of identity is essential." However, the corporation in question was not the alleged victim of the scheme, but was actually a defendant in the criminal prosecution, along with individual shareholders of the corporation. The existence of such a corporate defendant is essential to prosecution of it, while the corporate identity of an alleged victim, as distinguished from a partnership or unincorporated association, is not essential in proving a scheme to defraud by use of the mails. We therefore reject defendant Basan's contention on this point.

■ 9. Defendant Hutul contends that the Government was estopped from prosecuting him in the instant case since he had previously been prosecuted by the State of Illinois on the same facts. Hutul argues that his acquittal of the State charges of conspiracy to defraud certain insurance companies, obtaining money by false pretenses, and confidence game bars subsequent federal prosecution by the principles of res judicata, collateral estoppel, and the Seventh Amendment. Defendant Hutul also contends that he was prosecuted without Government authority.[35]

■ ■ First, the principles of res judicata and collateral estoppel act as a

bar to subsequent proceedings only when the parties to each action are the same, and the Federal Government is neither the same as nor in privity with that of the State of Illinois. See United States v. Wapnick, 198 F.Supp. 359 (D.C.E.D. N.Y.1961), aff'd. per curiam, 315 F.2d 96, cert. den. 374 U.S. 829, 83 S.Ct. 1868, 10 L.Ed.2d 1052; Rios v. United States, 256 F.2d 173 (9th Cir. 1958). Therefore, the principles of res judicata and collateral estoppel do not apply to the case at bar, and do not provide a substitute for a defense of double jeopardy.

■ Second, the Seventh Amendment is inapplicable to the instant case since it applies only to civil suits, not criminal.

■ Finally, we reject defendant Hutul's contention that his prosecution was without Government authority and therefore void. Defendant rests his argument on an April 6, 1959 press release of the Attorney General of the United States which stated that permission should be obtained from his office by a United States Attorney before the latter prosecutes a case when there had been an earlier state prosecution for substantially the same act. (See Petite v. United States, 361 U.S. 529, 80 S.Ct. 450, 4 L. Ed.2d 490 (1960)). Since such permission was not obtained in the present prosecution, defendant Hutul argues, it was without Government authority and void.

We disagree. A letter, press release, or similar statement by the Attorney General, which is not promulgated as a regulation of the Justice Department and published in the Federal Register, cannot serve to invalidate an indictment returned by the Grand Jury. Rather, such a statement is merely a "housekeeping provision" of the Justice Department and is so limited in its effect. Sullivan

cert. den. 308 U.S. 577, 60 S.Ct. 94, 84 L.Ed. 484.

35. Defendant Hutul does not claim that his Fifth Amendment right against double jeopardy was abridged. Indeed, it is well established that a federal government is not barred by the double jeopardy clause from prosecuting a person for the same acts for which he was previously acquitted in a state court. Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959).

v. United States, 348 U.S. 170, 173, 75 S.Ct. 182, 99 L.Ed. 210 (1954). Accordingly, we reject defendant Hutul's arguments on the issue of estoppel.

10. Defendant Mitchell contends that the district court abused its discretion by not ordering a presentence report on her before passing sentence. Rule 32(c), Fed.Rules Crim.Proc., provides that the probation service of the court shall make a presentence investigation "unless the court otherwise directs." The decision to direct that no presentence investigation be made rests in the sound discretion of the district court. United States v. Fannon, 403 F.2d 391, 394 (7th Cir. 1968), vacated on other grounds, 394 U.S. 457, 89 S.Ct. 1224, 22 L.Ed.2d 416; United States v. Karavias, 170 F.2d 968 (7th Cir. 1948).

Defendant Mitchell has failed to show an abuse of such discretion or how she was prejudiced by the absence of a presentence report. The record reveals that Mitchell's attorney, in his argument in mitigation after judgment was rendered, brought out the facts necessary to make a proper determination for sentencing. Thus, the fact that defendant Mitchell was only 19 years of age at the time of the crime, was a first offender, and was not as actively involved in the scheme as the other defendants was brought out. On this basis, the court imposed a one-year sentence to be followed by two years probation, as compared to the five-year sentences imposed on the other defendants. It is not the function of this Court to substitute its judgment on the proper sentence for that of the district court which viewed the demeanor and deportment of the defendants standing before it. While the use of presentence investigations and reports should be encouraged, we find no abuse of discretion in the instant case.

11. We find no merit in the remaining contentions advanced by the various defendants, and choose not to burden this already lengthy opinion with a discussion of them.[36]

For the foregoing reasons, the judgments of conviction are affirmed.

The Court expresses its appreciation to Mr. John Cleary, a member of the Chicago, Illinois bar, for his excellent services on appeal as court-appointed counsel for defendant Mitchell.

Affirmed.

---

36. These issues include: alleged prejudicial remarks by the district court, advanced by defendant Hutul; alleged errors in jury instructions, advanced by defendant Basan; and alleged error in the admission of certain documents into evidence, advanced by defendant Basan.